UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| AHMAD JAJEH, | ) |
| Plaintiff, | ) ) ) |
| | ) Case No. 09-cv-7227 |
| v. | ) |
| | ) Judge John W. Darrah |
| COUNTY OF COOK, | ) |
| Defendant. | ) ) ) |

## **MEMORANDUM OPINION AND ORDER**

Plaintiff, Dr. Ahmad Jajeh, is a Muslim of Syrian origin who was formerly employed as an attending physician in the Hematology/Oncology Department at the John H. Stroger Jr. Hospital of Cook County ("Stroger Hospital"). In April 2007, his employment was terminated. He brought this action against the County of Cook ("Cook County"), under Title VII of the Civil Rights Act of 1964, codified at 42 U.S.C. § 2000e *et seq.* Count I is a claim for retaliation, Count II is a claim for discrimination based on national origin, and Count III is a claim for discrimination based on religion. Cook County moved for summary judgment on all three counts.

## **BACKGROUND**

The following facts are taken from the parties' statements of undisputed material facts submitted in accordance with Local Rule 56.1.[1] Local Rule 56.1(a)(3) requires the party moving for summary judgment to provide "a statement of material facts as to which

---

[1] Both parties' briefs asserted facts that were not contained in their Local Rule 56.1 statements and, thus, not subject to challenge by the opposing party. Those facts were not considered for purposes of resolving Cook County's Motion for Summary Judgment.

the moving party contends there is no genuine issue." Rule 56.1(b)(3) then requires the nonmoving party to admit or deny each factual statement proffered by the moving party and to concisely designate any material facts that establish a genuine dispute for trial. *See Schrott v. Bristol-Myers Squibb Co.*, 403 F.3d 940, 944 (7th Cir. 2005). A litigant's failure to dispute the facts set forth in its opponent's statement in the manner required by Local Rule 56.1 results in those facts' being deemed admitted for purposes of summary judgment. *Smith v. Lamz*, 321 F.3d 680, 683 (7th Cir. 2003).

*Reduction of the Cook County Bureau of Health Budget*

Dr. Jajeh, a Muslim of Syrian origin, is a citizen of the United States. Def. 56.1(a) ¶ 1. He was employed as an attending physician in the Hematology/Oncology Department at Stroger Hospital in Cook County, Illinois, for approximately 16 years. Def. 56.1(a) ¶ 1. His employment was terminated on April 20, 2007. Def. 56.1(a) ¶ 1.

In 2007, the Cook County budget had a shortfall of $500 million; and $130 million had to be cut from the budget of the Cook County Bureau of Health. Def. 56.1(a) ¶ 6. From January 2007, Dr. Robert R. Simon, who is also a Muslim and is of Lebanese national origin, served as the Interim Chief of the Bureau of Health for Cook County, reporting directly to Cook County Board President Todd Stroger. Def. 56.1(a) ¶¶ 5, 11. On January 7, 2007, President Stroger and his administration directed Dr. Simon to submit a series of recommendations to trim the Bureau of Health budget, including Stroger Hospital's budget, in order to meet the goals of President Stroger and the County Board with the least possible impact on essential services and quality of care. Def. 56.1(a) ¶ 7. The recommendations were to be submitted prior to the budget-

approval deadline of February 29, 2007. Def. 56.1(a) ¶ 8. Dr. Simon put together a team of people to evaluate the facilities and present recommendations to effectuate $100 million in cuts from Cook County's health-care budget, and he was responsible for the final decisions regarding any recommendations as to budget cuts. Def. 56.1(a) ¶¶ 9-10.

Ultimately, over 650 employees of the Bureau of Health, including over 200 physicians, were laid off. Def. 56.1(a) ¶ 12. The layoff included many attending physicians from all Cook County hospitals, including Stroger Hospital. Def. 56.1(a) ¶ 13. The number of physician positions eliminated was determined by job title without regard for which individual physicians would be laid off. Def. 56.1(a) ¶ 16. Dr. Jajeh testified in his deposition that other Muslim physicians from Syria were employed at Stroger Hospital and not laid off. Def. 56.1(a) ¶ 15. Entire departments were cut, including orthopedics at Provident Hospital and occupational medicine, plastic surgery, and most dentistry at Stroger Hospital. Def. 56.1(a) ¶ 14.

Dr. Simon determined the level of necessary cuts at each institution and established the evaluation criteria for individual physicians. Def. 56.1(a) ¶¶ 14, 18. Seniority was not the controlling factor; rather, reasonable criteria included (1) negative performance reviews; (2) excess medical malpractice settlements where the error was clearly that of the physician; and (3) productivity, both in clinics, on wards, and in the operating rooms. Def. 56.1(a) ¶ 18. Race, age, gender, religion, or national origin would not be considered. Def. 56.1(a) ¶ 18.

Where only a portion of a department was to be eliminated, a standard procedure was established: the personnel for each position to be eliminated were interviewed by three other physicians with uniform test questions and a scoring key. Def. 56.1(a) ¶ 20. For each department, the same set of identical questions was given to each physician being interviewed. Def. 56.1(a) ¶ 23. The interviewers would be of mixed race, sex, and national background to the extent practicable so that the process was objective and nonbiased in an effort to conduct layoffs in a fair and open manner. Def. 56.1(a) ¶ 21. Each interview occurred separately, and each physician under consideration was interviewed three times separately by different persons. Def. 56.1(a) ¶ 24. Dr. Simon did not personally participate in employee interviews because he wanted to stay totally objective. Def. 56.1(a) ¶ 19. He was required to lay off friends he had known for 15 years. Def. 56.1(a) ¶ 19.

Stroger Hospital's Department of Medicine was among those that had to undergo partial lay-offs. Def. 56.1(a) ¶ 25. Three physicians were performing as hematologists at the time: Dr. Jajeh, Dr. Roslyn Catchatourian, and Dr. Margaret Telfer. Def. 56.1(a) ¶ 26. Three physicians conducted their interviews: Dr. Brendan Reilly, Chairman of the Department of Medicine; Dr. Enrique Martinez, Chief Medical Officer for the Ambulatory Community Healthcare Network for Cook County; and Dr. Krishna Das, an Associate Chair of Medicine at Stroger Hospital. Def. 56.1(a) ¶¶ 27-30. Each of the three physicians being evaluated filled out identical questionnaires and was interviewed separately by Drs. Reilly, Martinez, and Das. Def. 56.1(a) ¶ 31.

After the interviews, Dr. Reilly prepared a score sheet awarding or deducting points by question number based on a scoring key. Def. 56.1(a) ¶ 32. Dr. Catchatourian scored 1,640 points; Dr. Telfer scored 1,400 points; and Dr. Jajeh scored 984 points. Def. 56.1(a) ¶ 33. Dr. Catchatourian was awarded more points than Dr. Jajeh on question 7 (other job activities) because she was a specialist in bone-marrow transplants and because she had a key faculty designation. Def. 56.1(a) ¶ 34. Dr. Telfer was awarded more points than Dr. Jajeh on question 7 because she was director of the fellowship program in hematology. Def. 56.1(a) ¶ 35. Points were deducted from Dr. Jajeh's score on question 6 (negative performance reviews) because he had been the subject of a pre-disciplinary hearing report, which directed him to participate in anger-management counseling. Def. 56.1(a) ¶ 36. That report stated that Dr. Jajeh had violated policies by leaving his clinic duties and patients without permission to attend a pharmaceutical focus group for pay and had failed to follow supervisors' instructions. Def. 56.1(a) ¶ 37. Also, although Dr. Jajeh stated that he could speak Spanish in response to one question, no additional points were awarded on that basis because Dr. Martinez determined he could not. Def. 56.1(a) ¶ 38.

The position occupied by Dr. Jajeh was then eliminated from the 2007 County budget; and Dr. Jajeh was sent a letter of termination, stating that he was laid off due to the budget cuts. Def. 56.1(a) ¶¶ 39, 40. Dr. Jajeh was the only Muslim and Syrian in the Division of Hematology/Oncology. Pl. 56.1(b) ¶ 2. At the time of the interviews, Dr. Telfer was employed on a part-time basis; she was made a full-time employee in mid-2007. Pl. 56.1(b) ¶ 36.

5

The Cook County Separation Action form prepared for each employee who leaves County employment contains a field for whether the employee should be rehired; Dr. Lad marked the "N" box (as opposed to "Y") and wrote, "disciplinary problems, not a team player (difficulties with interpersonal relationships)." Def. 56.1(a) ¶ 50. The Personnel rules provide that physicians who are laid off are to be placed on lists for preferential reinstatement. Pl. 56.1(b) ¶ 37. In September 2008, Dr. Jajeh sent a request to Dr. Lad, requesting to be rehired. Def. 56.1(a) ¶ 51. Dr. Lad testified that he did not consider Dr. Jajeh for rehire for the reasons he indicated on the aforementioned form. Def. 56.1(a) ¶ 51. In July 2009, Dr. Jajeh's position was re-funded and filled by another physician. Def. 56.1(a) ¶ 52.

*Pre-Termination Activity*

Dr. Catchatourian began her employment in the Hematology/Oncology Department in or about 2001. Pl. 56.1(b) ¶ 1. Dr. Jajeh testified that beginning in the summer of 2003, Dr. Catchatourian started harassing him by subjecting him to derogatory remarks, ethnic slurs, and inflammatory statements. Pl. 56.1(b) ¶ 3. Dr. Lad was and continues to be Chairman of the Department of Oncology. Def. 56.1(a) ¶ 41. He started his employment with Cook County in December 2003. Pl. 56.1(b) ¶ 7. He is not Syrian or Muslim. Pl. 56.1(b) ¶ 7. Dr. Lad did not participate in the evaluation process for Drs. Jajeh, Catchatourian, and Telfer. Def. 56.1(a) ¶ 41. Nor was he involved in the decision to eliminate one of the positions in hematology/oncology; in fact, he objected to the elimination of that position. Def. 56.1(a) ¶ 42.

On September 23, 2004, Dr. Jajeh wrote a letter to Dr. Lad, complaining about Dr. Catchatourian and explaining that he had previously complained to Dr. Reilly about discrimination. Pl. 56.1(b) ¶ 8. On October 26, 2004, Dr. Jajeh again wrote to Dr. Lad and sent a copy of the correspondence to Dr. Reilly. Pl. 56.1(b) ¶ 9. Although he stated that he had "been discriminated against" and complained of Dr. Catchatourian's "unfair and harassing attitude," the letter makes no reference to any unfair treatment on the basis of Dr. Jajeh's religion or national origin. *See* Pl. Ex. 3. On December 22, 2005, Dr. Jajeh wrote another note to Dr. Lad in which he complained of unspecified working conditions; stated that Dr. Lad's conduct was "a form of favoritism, harassment and feeling of grandiosity"; and threatened to go to peer review, the EEOC, or a court of law. Pl. 56.1(b) ¶ 10; Pl. Ex. 4. The note did not mention Dr. Jajeh's religion or national origin. On December 27, 2005, Dr. Jajeh wrote to Dr. Janice Benson, President of the Medical Staff at Stroger Hospital, complaining that Dr. Lad subjected him to favoritism, unfair treatment, and harassment, and that Dr. Catchatourian supported that treatment. Pl. 56.1(b) ¶ 11; Pl. Ex. 5. He also stated, "I am requesting you to investigate the isolation, lack of support, harassment and the insults I am facing by Dr. Lad who had favorite Dr. Catchatourian domineering and obstructive attitude [*sic*]." Pl. Ex. 5. Again, Dr. Jajeh did not mention any issues having to do with his religion or national origin.

Dr. Jajeh asserts other issues with Dr. Lad's conduct toward him. In December 2005, Dr. Lad charged Dr. Jajeh with sick time for a three-day period in which Dr. Jajeh actually worked. Pl. 56.1(b) ¶ 20. Dr. Jajeh also complains about Dr. Lad's use of some grants that had been under Dr. Jajeh's control. Dr. Jajeh was a co-principal

7

investigator in four research grants initiated by Evanston Northwestern Healthcare and awarded by the National Institute of Health, with which Stroger Hospital collaborated. Pl. 56.1(b) ¶ 13. In August 2004, Dr. Lad directed Dr. Jajeh to transfer ownership of the grant funds to Dr. Lad. Pl. 56.1(b) ¶ 13. Dr. Lad then withdrew money from the accounts and used it for incidental department expenses. Pl. 56.1(b) ¶ 15. In early February 2006, Dr. Jajeh met with Johnnie Brown, Chief of Stroger Hospital, regarding what Dr. Jajeh believed to be the misappropriation of his grant money. Pl. 56.1(b) ¶ 16. Dr. Reilly learned of the meeting and informed Dr. Lad about it. Pl. 56.1(b) ¶ 16.

On February 16, 2006, Dr. Lad sent Dr. Jajeh a letter, notifying him that an administrative hearing would be held to investigate Dr. Jajeh's alleged abandonment of clinical duties. Pl. 56.1(b) ¶ 24. Dr. Jajeh was charged with, among other things, leaving the clinic with patients still waiting – without approval or notice – to attend an interview with a pharmaceutical company for which he was paid. Def. 56.1(a) ¶ 43. Dr. Jajeh appeared at an administrative hearing on March 8, 2006, before Human Resources Director, Paris Partee, who acted as the Hearing Officer. Pl. 56.1(b) ¶ 21. On March 14, 2006, Ms. Partee, who is not Syrian or Muslim, issued a letter documenting her findings. Pl. 56.1(b) ¶¶ 21, 22. Her report concluded that Dr. Jajeh had violated three policies: "(1) being out of his assigned work area without permission; (2) double-dipping; and (3) failure to follow the instructions of a person authorized to supervise." Def. 56.1(a) ¶ 45. The report further stated that Dr. Jajeh admitted leaving work early to participate in a focus group for pay. Def. 56.1(a) ¶ 46. It was recommended that Dr. Jajeh attend anger-management counseling with the Employee Assistance Program.

Def. 56.1(a) ¶ 47. Dr. Lad did not receive Ms. Partee's letter until May 2006; and Dr. Jajeh did not receive it until July 31, 2006. Pl. 56.1(b) ¶ 22.

Dr. Jajeh was up to have his credentials renewed by Stroger Hospital on April 1, 2006. Pl. 56.1(b) ¶ 28. Although he submitted his application to Dr. Lad in December 2005, Dr. Lad did not submit the paperwork to the credentials committee until June 2006. Pl. 56.1(b) ¶ 28. Dr. Lad was under the impression that Dr. Jajeh's privileges had lapsed and that Dr. Jajeh had been suspended as of June 30, 2006. Pl. 56.1(b) ¶ 29. Dr. Lad considered and communicated to Dr. Reilly the possibility of using this excuse to terminate Dr. Jajeh in order to "solve a problem that has been going on ever since [Dr. Lad arrived at the hospital]." Pl. 56.1(b) ¶ 29.

On or about May 25, 2006, Dr. Lad completed a form regarding the renewal of Dr. Jajeh's credentials and indicated that an administrative hearing on March 8, 2006, resulted in a written warning regarding insubordination and double dipping and that Dr. Jajeh was referred to the Employee Assistance Program for anger-management counseling. Pl. 56.1(b) ¶ 31. Dr. Lad also noted that his recommendation for reappointment was made "with reservation." Pl. 56.1(b) ¶ 31. In December 2003 and in November 2005, Dr. Lad recommended renewing Dr. Jajeh's privileges without reservation. Pl. 56.1(b) ¶ 30.

Dr. Jajeh filed his first Charge of Discrimination with the EEOC on October 30, 2006, alleging retaliation and discrimination on the basis of his religion and national origin. Def. 56.1(a) ¶ 48; Pl. 56.1(b) ¶ 12. Shortly after the Charge was filed, Dr. Lad received a copy and described it as "a charge of discrimination against me by

Dr. Jajeh." Pl. 56.1(b) ¶ 12. Although Dr. Reilly claims that he cannot specifically recall when he learned about the Charge, he admitted that it would have been unusual for Dr. Lad not to have alerted him to the fact that it had been filed. Pl. 56.1(b) ¶ 12. Dr. Jajeh filed two more Charges of Discrimination after he was laid off: one on May 4, 2007, and one on September 27, 2007. Def. 56.1(a) ¶ 49.

## LEGAL STANDARD

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial responsibility of informing the court of the basis for its motion and identifying the evidence it believes demonstrates the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). If the moving party meets this burden, the nonmoving party cannot rest on conclusory pleadings but "must present sufficient evidence to show the existence of each element of its case on which it will bear the burden at trial." *Serfecz v. Jewel Food Stores*, 67 F.3d 591, 596 (7th Cir. 1995) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986)). A mere scintilla of evidence is not sufficient to oppose a motion for summary judgment; nor is a metaphysical doubt as to the material facts. *Robin v. Espo Eng. Corp.*, 200 F.3d 1081, 1088 (7th Cir. 2000) (citations omitted). Rather, the evidence must be such "that a reasonable jury could return a verdict for the nonmoving party." *Pugh v. City of Attica, Ind.*, 259 F.3d 619, 625 (7th Cir. 2001) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (*Anderson*)).

In considering a motion for summary judgment, the court must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in the nonmoving party's favor. *Abdullahi v. City of Madison*, 423 F.3d 763, 773 (7th Cir. 2005) (citing *Anderson*, 477 U.S. at 255). The court does not make credibility determinations or weigh conflicting evidence. *Id.*

## ANALYSIS

Dr. Jajeh complains that Cook County discriminated against him on the basis of his religion (Muslim) and his national origin (Syrian) and retaliated against him for complaining about Cook County's discriminatory conduct. Cook County moves for summary judgment on all counts.

### *Discrimination*

A plaintiff can establish a claim of discrimination under Title VII under the direct or indirect method of proof. *See Winsley v. Cook Cnty.*, 563 F.3d 598, 604 (7th Cir. 2009) (*Winsley*). Under the direct method, he must present direct evidence that the conduct of which he complains was the result of discriminatory animus (essentially an admission by the employer), *Rogers v. City of Chicago*, 320 F.3d 748, 753 (7th Cir. 2003), or by presenting circumstantial evidence that creates "a convincing mosaic of discrimination," *Winsley*, 563 F.3d at 604.

Here, Dr. Jajeh has not identified any direct evidence that those responsible for the decision to terminate his employment held any discriminatory animus toward him on the basis of his religion or national origin. Accordingly, he can only prove his claim under the direct method if he can identify a "convincing mosaic of discrimination."

He cannot. Circumstantial evidence can consist of suspicious timing, ambiguous statements, differing treatment of similarly situated employees outside the protected class, or behavior toward employees in the protected group. *Hemsworth v. Quotesmith.com Inc.*, 476 F.3d 487, 491 (7th Cir. 2007). First, Dr. Jajeh asserts that he would not have been laid off had Dr. Simon used seniority as the determining factor. This may be true, but the decision not to use seniority as the primary consideration was one that affected all employees. There is no evidence to suggest that Dr. Simon applied this criterion to hundreds of physicians in an effort to discriminate against Dr. Jajeh, specifically, or to Muslims or persons of Syrian origin, generally. Indeed, Dr. Jajeh admitted that other Muslim doctors of Syrian origin were not laid off. Second, Dr. Jajeh maintains it is "highly suspicious" that Dr. Reilly decided to sacrifice one additional physician from his department and that the Hematology/Oncology department was targeted instead of other clinics. Dr. Jajeh does not offer any evidence to support his contention that these decisions are suspicious. And as a rule, courts do not "sit as a super-personnel department that reexamines an entity's business decisions" in cases where discrimination is alleged. *Hong v. Children's Memorial Hosp.*, 993 F.2d 1257, 1262-63 (7th Cir. 1993) (citation and internal quotation marks omitted).

Dr. Jajeh also asserts he can prove unlawful discrimination under the indirect method of proof. In order to establish a *prima facie* case of discrimination under the indirect method, a plaintiff must prove: (1) that he was a member of a protected class; (2) that he suffered an adverse employment action; (3) that he was performing his job satisfactorily; and (4) that similarly situated individuals outside his protected class were

treated more favorably. *LaFary v. Rogers Group, Inc.*, 591 F.3d 903, 907 (7th Cir. 2010). If the plaintiff establishes a *prima facie* case, the burden shifts to the defendant to produce a legitimate, non-invidious reason for the adverse employment action. *Hobbs v. City of Chicago*, 573 F.3d 454, 460 (7th Cir. 2009). The burden then shifts back to the plaintiff to show that the reasons given by the defendant are pretextual. *Id.*

Here, Cook County does not dispute the first three elements of Dr. Jajeh's *prima facie* case. It argues only that Dr. Jajeh cannot prove the fourth element because he "cannot distinguish himself from the other 200 physicians of various races and national origin who were laid off." Mem. in Supp. of Def. Mot. for Summ. J. 9. In so arguing, Cook County misinterprets the required elements of a *prima facie* case of discrimination. The primary act of which Dr. Jajeh complains is the termination of his employment. For Cook County to argue that he was not treated any worse than others who were also laid off misses the point. Dr. Jajeh must be compared, not to the other doctors who lost their jobs, but to those doctors that did not. Here, Dr. Jajeh identifies two such persons: Dr. Catchatourian and Dr. Telfer. Cook County did not argue that Dr. Jajeh would be unable to show that those two doctors are similarly situated. Therefore, Dr. Jajeh has established a *prima facie* case of discriminatory termination for purposes of withstanding summary judgment.

Cook County nonetheless maintains that Dr. Jajeh was laid off due to a budget shortfall and that he was selected for termination based on neutral criteria. The evidence shows that Cook County had to lay off hundreds of employees and scores of doctors due to a budget shortfall. Some departments were eliminated entirely. Others were only

partially eliminated. For those departments that were partially eliminated, each physician had to complete a questionnaire and submit to interviews. The evidence shows that that procedure was followed for Dr. Jajeh and that, of the three doctors who held his position, he scored lowest. Ultimately, Cook County's proffered reason behind the decision to eliminate Dr. Jajeh's position is sufficient to shift the burden back to Dr. Jajeh to show pretext.

"Pretext is a 'lie, specifically a phony reason for some action.'" *Sublett v. John Wiley & Sons, Inc.*, 463 F.3d 731, 737 (7th Cir. 2006) (quoting *Russell v. Acme-Evans, Co.*, 51 F.3d 64, 68 (7th Cir. 1995)). To demonstrate pretext, a plaintiff must show: (1) that the employer's "nondiscriminatory reason was dishonest" and (2) that the employer's "true reason was based on a discriminatory intent." *Fischer*, 519 F.3d at 403 (internal quotation marks and citation omitted). A plaintiff may prove pretext with direct evidence or indirectly by showing "that the employer's reason is not credible or that the reason is factually baseless." *Perez v. Illinois*, 488 F.3d 773, 777-78 (7th Cir. 2007) (citations omitted). "[The plaintiff] must also provide evidence of at least an inference that the real reason for [the adverse employment action] was discriminatory." *Id.* (internal quotation marks and citations omitted).

Here, Dr. Jajeh has provided little or no evidence of any unlawful discrimination on the part of those responsible for the decision to eliminate his position. There is absolutely no evidence that would support even an inference that Dr. Simon (the person ultimately responsible for cutting Dr. Jajeh's position) held any animus toward Muslims

or persons of Syrian origin.[2] Nor is there any evidence to support an inference that any of the three doctors who interviewed Dr. Jajeh harbored any such animus. Indeed, the only person Dr. Jajeh accuses of any discrimination against him because of his religion and national origin is Dr. Catchatourian; and the evidence necessary to avoid summary judgment as to her is insufficient for multiple reasons.

First, Dr. Jajeh's characterization of Dr. Catchatourian as anti-Muslim and anti-Syrian lacks support. Beyond a conclusory statement that Dr. Catchatourian subjected him to unspecified derogatory remarks, ethnic slurs, and inflammatory statements at some point in time, the sole support for Dr. Jajeh's assertion that Dr. Catchatourian treated him poorly on account of his religion and national origin is a "Declaration" submitted in connection with his response to Defendants' Motion for Summary Judgment. As Cook County notes, Dr. Jajeh's "Declaration" is unsworn. It is not notarized and does not affirm that his statements are "true and correct" and made "under penalty of perjury," as required by 28 U.S.C. § 1746. As such, it should not be considered. *See DeBruyne v. Equitable Life Assurance Soc. of the U.S.*, 920 F.2d 457, (7th Cir. 1990) (stating that an "affidavit," which was not notarized and did not subject the signer to penalties of perjury, "was not within the range of evidence that the district court could consider" on summary judgment); *Mokry v. Partylite Worldwide, Inc.*, No. 07 C 0972, at *6 (N.D. Ill. Aug. 20, 2009) ("District courts have the discretion to disregard

---

[2] Although Cook County points out the fact that Dr. Simon is a Muslim of Middle-Eastern origin, this fact is of no consequence; there is no presumption that a supervisor would not discriminate against an employee in his protected class. *See Stinnett v. City of Chicago*, 630 F.3d 645, 649 (7th Cir. 2011).

15

affidavits that are neither notarized nor made under the penalty of perjury.") (citing *Gilty v. Vill. of Oak Park*, 919 F.2d 1247, 1255 n.13 (7th Cir. 1990)).

Second, there is no evidence that Dr. Catchatourian was responsible for the decision to eliminate Dr. Jajeh's position. *Cf. Ciaramonte v. Fashion Bed Grp.*, 129 F.3d 391, 397 (7th Cir.1997) ("Statements by inferior employees are not probative of an intent to discriminate by the decisionmaker." (citation omitted)). The evidence shows that Dr. Catchatourian had to interview for her position along with Dr. Jajeh and Dr. Telfer. Drs. Reilly, Das, and Sanchez conducted the interviews; and the ultimate decision was made by Dr. Simon. Dr. Jajeh has presented no basis for a jury to reasonably infer that his position was eliminated because a coworker held discriminatory views about his religion or national origin. Accordingly, Cook County is entitled to summary judgment on Dr. Jajeh's discriminatory termination claims.

Dr. Jajeh also asserts that his discrimination claims encompass claims regarding a hostile work environment. To support such a claim, a plaintiff must establish (1) that he was subjected to unwelcome harassment, (2) on his national origin and/or religion, (3) that was severe or pervasive enough to alter the conditions of his environment and create a hostile and abusive working environment, and (4) a basis for employer liability. *Lucki v. Ameritech Corp.*, 389 F.3d 708, 713 (7th Cir. 2004).

Although Dr. Jajeh asserts that Dr. Catchatourian singled him out for discriminatory treatment and that he repeatedly complained to Drs. Reilly and Lad about harassment, generally, there is no evidence to support Dr. Jajeh's claim that any harassment occurred because he was a Muslim or of Syrian national origin, much less a

16

level of harassment sufficient to create a hostile and abusive working environment. None of Dr. Jajeh's correspondence with other Stroger Hospital personnel even mentions his religion or national origin. Cook County is entitled to summary judgment on Dr. Jajeh's hostile-work-environment claims.

*Retaliation*

Dr. Jajeh also claims that Cook County retaliated against him for complaining about discriminatory treatment. Like claims of discrimination, a claim for retaliation under Title VII can be proven under the direct or indirect method. *Hill v. Potter*, 625 F.3d 998, 1000-01 (7th Cir 2010). Under the direct method, the plaintiff must prove the following: (1) that he engaged in statutorily protected activity; (2) that he suffered a materially adverse action by his employer; and (3) a causal connection between the two events. *Argyropoulos v. City of Alton*, 539 F.3d 724, 733 (7th Cir. 2008). Under the indirect method, the first two elements are the same, but the third is different: a plaintiff must prove that he was meeting his employer's legitimate expectations and that he was treated less favorably than similarly situated employees who did not engage in protected activity. *Leonard v. E. Ill. Univ.*, 606 F.3d 428, 431 (7th Cir. 2010). If the plaintiff can do so, the burden shifts to the defendant to establish a nondiscriminatory reason for the employment action. *Nichols v. S. Ill. Univ.-Edwardsville*, 510 F.3d 772, 785 (7th Cir. 2007). If defendants can establish such a reason, the plaintiff must offer sufficient proof of pretext. *Id.*

Dr. Jajeh's retaliation claim fails for the same reason as his discrimination claim: he has not identified evidence sufficient to connect the loss of his job with any unlawful conduct on the part of Cook County's decision makers.

On October 30, 2006, following several complaints to various Stroger Hospital personnel regarding vague allegations of harassment, Dr. Jajeh filed an EEOC charge, complaining of discrimination on the basis of his religion and national origin. He was laid off in April 2007. There is no evidence of any statutorily protected activity that occurred between October 30, 2006, and the termination of Dr. Jajeh's employment. Dr. Jajeh lost his job over five months after he last complained of discrimination, at the same time that over 200 other physicians were laid off from County hospitals. Thus, the timing is not itself suspicious. *Cf. Tomanovich v. City of Indianapolis*, 457 F.3d 656, 665 (7th Cir. 2006) (holding that four-month period between protected activity and adverse action was insufficient to establish a causal connection).

Additionally, all of Dr. Jajeh's complaints concerned Dr. Catchatourian and Dr. Lad. There is no evidence that either of those individuals were in a position to influence Dr. Simon to select Dr. Jajeh's position for elimination. Accordingly, Dr. Jajeh's claim fails under either method of proof. Under the direct method, he lacks evidence of any causal connection between the loss of his job and his earlier complaints. Under the indirect method – assuming Dr. Jajeh established a *prima facie* case of retaliation – Dr. Jajeh has presented no evidence from which a jury could infer that the termination of Dr. Jajeh's employment was not based on the procedure followed during county-wide budget cuts, as Cook County maintains, but because Dr. Jajeh had

complained about discrimination and harassment over five months earlier. Cook County is entitled to summary judgment on Dr. Jajeh's retaliation claim.

## CONCLUSION

For the reasons discussed above, Cook County's Motion for Summary Judgment is granted. Summary judgment is awarded in favor of Cook County and against Dr. Jajeh on all counts.

Date: May 12, 2011

JOHN W. DARRAH
United States District Court Judge